IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KAREN FRAZIER, | ) | CASE NO. 5:11 CV 2747 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Karen Frazier ("Plaintiff" or "Frazier") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") finding her disabled for the period August 29, 2007, through September 30, 2008, but not disabled from October 1, 2008, through November 29, 2010. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth below, the finding of the Administrative Law Judge ("ALJ") that Frazier experienced medical improvement as of October 1, 2008, is supported by substantial evidence. However, the ALJ failed to explain the connection between the medical improvement and the revision he made in Frazier's Residual Functional Capacity ("RFC") effective that date, which eliminated a limitation that Frazier would either be absent from work, late getting to work, or having to leave work early at least once per week because of her impairments. The revised RFC was the basis for the ALJ's conclusion that Frazier was no longer disabled. Accordingly, the decision of the Commissioner should be **REVERSED** and the case **REMANDED** for further proceedings consistent with this recommendation.

## I. Procedural History

On December 10 and 12, 2007, Frazier filed her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging a disability onset date of

August 29, 2007.  Frazier claimed that she was disabled due to fibromyalgia, degenerative disc disease, overactive bladder, irritable bowel syndrome, and high blood pressure.  Tr. 122-27, 142, 147.  Frazier's applications were denied initially and upon reconsideration.  Tr. 90-96, 100-13.  On April 14, 2010, Administrative Law Judge Peter R. Bronson (the "ALJ") presided over a video hearing from Cleveland, Ohio, with Frazier appearing and testifying from Canton, Ohio.  Tr. 47-85.  On November 29, 2010, the ALJ issued a Partially Favorable Notice of Decision, finding Frazier was disabled between August 29, 2007 and September 30, 2008, and not disabled for all subsequent dates.  Tr. 8-39.

For the period prior to October 1, 2008, the ALJ's RFC determination included a limitation that Frazier would either be absent from work, late getting to work, or having to leave work early at least once per week because of her impairments. Tr. 26-28.  The ALJ determined, based on the testimony of the Vocational Expert ("VE"), that no jobs existed in significant numbers in the national economy that would be available to a person with that limitation.  Tr. 31. However, the ALJ went on to find that Frazier's medical condition improved as of October 1, 2008.  The ALJ then determined that Frazier's RFC should be revised as of that date to eliminate altogether the limitation related to missing time from work. Tr. 34.  Based on the revised RFC and the VE's testimony, the ALJ determined that Frazier was no longer disabled as of October 1, 2008, because there were jobs that existed in significant numbers in the national economy that Frazier could perform.  Tr. 36-37.

Frazier requested review of the ALJ's decision by the Appeals Council.  The request was denied on November 15, 2011, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II.  Evidence

### A.  Background

Frazier was born on November 8, 1966.  Tr. 122, 125.  At the time of the administrative hearing, she was 43 years old.  Frazier has a high school education and past relevant work as a nursing assistant, laborer, group home manager, and press operator.  Tr. 148, 152.

### B.  Medical Evidence[1]

#### 1.  Medical Evidence Before September 30, 2008

On September 11, 2007, Frazier saw Melanie Mirande, M.D. for hypertension and high blood pressure.  Tr. 303-05.  The hypertension was described as moderate to severe.  Tr. 303. Dr. Mirande conducted a physical examination of Frazier, with generally normal results.  Tr. 303-04.

On October 18, 2007, Frazier was seen by Vladimir Djuric, M.D., at the request of Dr. Mirande.  Tr. 356-59.  Frazier complained of chronic low back pain, bilateral hip pain, and bilateral lower extremity pain/paraesthesias.  Tr. 356.  She described her pain as excruciating at times, and reported having difficulties performing daily activities such as mopping the floor.  *Id*. Frazier reported her pain that day as a seven out of ten, while indicating that it typically ranged from four to ten.  *Id.*  On examination, she had a guarded, but symmetric, gait pattern with no evidence of antalgia.  Tr. 357.  In the midlumbar area, Frazier had restriction of extension and side bending.  Tr. 357.  She also had tenderness and pain in the lower lumbar region, but a negative straight leg raise and good hip rotation.  Tr. 357.  She had normal knees and no joint deformity, muscle atrophy, or edema.  Tr. 357.  Neurologically, Frazier had allodynia to pinprick at the right thigh, decreased pinprick sensation in the ankles, and some giveaway weakness in the foot, but no focal neurological deficits.  Tr. 357.

---

[1] Frazier's brief focuses primarily on her physical impairments.  Therefore, this Report & Recommendation discusses Frazier's medical history as it relates to her physical impairments.

On October 22, 2007, Frazier saw John Andrefsky, M.D., for her complaints of headaches.  Tr. 206-07.  Frazier's cranial nerves were normal and she had full motor strength her extremities, normal tone, and no atrophy.  Tr. 206.  Dr. Andrefsky noted that Frazier's headache frequency and severity had improved with medication and that she was having one headache per week.  Tr. 207.  On October 23, 2007, Frazier underwent a lumbar spine MRI, which showed a suspicious right foraminal herniated disc at L4-5, mild disc height loss at L3-4 without additional significant findings, and normal findings at the remaining lumbar levels.  Tr. 583.

On November 5, 2007, Frazier visited Dr. Djuric for a follow-up.  Tr. 353-54.  At this time, Dr. Djuric gave Frazier her first transforaminal epidural injection.  *Id*.  Dr. Djuric indicated a diagnosis of lumbar herniated nucleus pulposus at L4-5 with associated radiculopathy.  Tr. 353.

On November 19, 2007, Frazier saw Dr. Mirande, who noted that Frazier's hypertension was moderate to severe with associated headache, shortness of breath, and chest pain.  Tr. 296.  Frazier reported nausea, but was feeling well with improved extremity swelling and dizziness.  Tr. 296.  Dr. Mirande documented generally normal physical examination findings, with no edema.  Tr. 296.  On November 23, 2007, Dr. Mirande diagnosed Frazier with diabetes.  Tr. 295.

On December 4, 2007, Frazier returned to Dr. Djuric.  Tr. 351-52.  On examination, a moderate restriction of lumbar mobility was noted.  *Id*.  Frazier received a second transforminal epidural injection of L5 at this time.  *Id*.  On December 17, 2007, Frazier saw Dr. Djuric for a follow-up appointment.  Tr. 350.  She reported muscle spasms in her back and radiating extremity pain.  *Id*.  She also reported her pain to be eight out of ten.  *Id.*  On examination, she had good lumbar flexion, moderate restriction of extension, and tenderness across the lumbosacral junction.  *Id*.  Straight leg raise was negative.  *Id.*  Dr. Djuric indicated that he did not have a clear explanation for Frazier's response to the injection, and noted a reluctance to administer any further injections.  *Id*.

On December 28, 2007, Frazier saw chiropractor Gregory Pastrick, D.C., for low back and right hip pain.  Tr. 317-19, 382.  Tenderness was noted from the cervical through the lumbosacral spine, most notably in the lower lumbar region.  *Id.*  Decreased range of motion in the cervical, thoracic, and lumbar regions were noted. *Id.*

On January 3, 2008, Frazier returned to Dr. Djuric for a follow-up.  Tr. 348-49.  She reported that she was doing better.  Tr. 348.  She ambulated with a symmetric gait and had moderate restriction of lumbar range of motion with diminished extension and tenderness, but had a negative straight leg raise test.  Tr. 348.  Dr. Djuric gave Frazier a lumbar zygapophyseal joint injection at L4-5.  Tr. 348.

On January 14, 2008, an x-ray of the lumbar spine was performed by Dr. Pastrick and showed abnormal alignment of lumbar vertebrae, possibly secondary to muscle spasm and/or joint dysfunction.  Tr. 320.  No evidence of fracture, dislocation, or neoplastic change was visualized, and osseous density appeared adequate.  *Id.*  Frazier visited Dr. Pastrick fourteen times from February through June, 2008. Tr. 371-81.

On February 20, 2008, state agency reviewing physician Teresita Cruz, M.D., completed a physical residual functional capacity assessment.  Tr. 322-28.  Dr. Cruz opined that Frazier could lift fifty pounds occasionally and twenty-five pounds frequently.  Tr. 322.  She also found that Frazier could stand and/or walk for six hours and sit for six hours, and  could frequently stoop, crouch, or crawl.  Tr. 322-23.

On March 11, 2008, Frazier saw gastroenterologist Sanjiv Khetarpal, M.D., who assessed Frazier with gastroesophageal reflux disease and irritable bowel syndrome.  Tr. 338.

Frazier visited Dr. Djuric on March 13, 2008, with complaints of increased pain in the lower back, particularly on the right side.  Tr. 346-47.  Dr. Djuric noted that Frazier had tenderness and increased lumbar muscle tone, greater right than left, and normal gait and

balance.  Tr. 346.  Dr. Djuric gave Frazier a lumbar medial branch block addressing L3-4 and L4-5 facet joints.  *Id*.

On April 11, 2008, Dr. Pastrick completed a physical residual functional capacity questionnaire.  Tr. 360-62.  He opined that Frazier could lift less than ten pounds occasionally and less than ten pounds frequently, for thirty minutes at a time; that she could stand and walk for three hours and sit for three hours; that she would need to lie down approximately three times, at unpredictable intervals, during a work shift; that she would need the opportunity to shift position at will; that she could never kneel, crawl, balance, twist, crouch, or climb stairs or ladders; and that she would have limitations with reaching overhead, pushing, pulling, and fingering.  *Id*.

On May 8, 2008, Frazier visited Dr. Khetarpal for a follow-up after a colonoscopy she received two weeks prior.  Tr. 400-02.  Frazier complained of ongoing diarrhea and abdominal pain.  Tr. 400.  Except for some right upper quadrant abdominal tenderness, Frazier had a negative physical exam.  Tr. 400, 431.

On June 5, 2008, Frazier returned to Dr. Andrefsky and reported daily headaches with migraines once per week.  Tr. 492-93.  She reported four episodes in which she felt cold, vomited, and then passed out.  Tr. 492.  Dr. Andrefsky indicated the loss of consciousness was most likely secondary to hypotension, although transient ischemic attack, seizure, stroke, or cardiac arrhythmia could not be ruled out.  Tr. 493.

Frazier saw Dr. Khetarpal on August 13, 2008, for complaints of abdominal pain and nausea.  Tr. 394-96.  Dr. Khetarpal noted bleeding and nausea likely related to gastroparesis versus gastroesophageal reflux disease and chronic diarrhea likely related to irritable bowel syndrome.  Tr. 395.  On August 28, 2008, Dr. Khetarpal performed a gastric biopsy and esophagogastroduodenoscopy (EGD) on Frazier.  Tr. 622-24.  The EGD revealed a hiatal hernia

with no evidence of reflux esophagitis or Barrett's esophagus. Tr. 623. Frazier was assessed with a normal descending duodenum and food residue consistent with gastroparesis. *Id.* Dr. Khetarpal noted that the use of Reglan to treat nausea and vomiting was appropriate. Tr. 624.

On September 30, 2008, Frazier was seen by Dr. Khetarpal. Frazier had a normal abdominal examination. *Id.* In a letter to Dr. Mirande from that same date, Dr. Khetarpal noted that Frazier "finally started doing well" and that "[t]he use of Reglan certainly has helped her symptoms." Tr. 502. He further reported that her gastroparesis symptoms, nausea, and abdominal distention had resolved, although she still had intermittent episodes of diarrhea. *Id.*

The ALJ assigned September 30, 2008, as the last day on which Frazier was disabled, finding that medical improvement occurred that was related to her ability to work. Tr. 14.

### 2.    Medical Evidence After September 30, 2008

On October 22, 2008, Frazier was seen by Dr. Mirande. Tr. 619. Frazier reported that she felt well but complained of back pain located in the lower back without radiation. *Id.* On examination, she had moderate and generalized tenderness. Tr. 619-20.

On October 27, 2008, Dr. Andrefsky noted that Frazier reported having one to two headaches per week and had experienced an onset of low back pain after taking clothes out of the dryer. Tr. 478. On examination, her cranial nerves and motor function were normal, with full strength and no atrophy. *Id.* Frazier was described as stable in terms of her headache frequency and severity. Tr. 479.

On November 20, 2008, Frazier underwent an open lumbar spine MRI, which presented similar findings to those seen on earlier examinations. Tr. 472-73, 573. The MRI showed that a disc osteophyte complex in a right neural foramen at L4-5 appeared to displace the exiting L4 nerve root. *Id.* There was also asymmetric right foramina annular bulging or disc herniation at L3-4 without obvious contact of the nerve root. *Id.*

On December 2, 2008, Frazier saw Dr. Andrefsky for her low back pain. Tr. 469-71. Dr. Andrefsky ordered an electromyography and nerve conduction velocity examination, which was performed on December 16, 2006. Tr. 462-66. The study was normal, with no evidence of a focal mononeuropathy, peripheral polyneuropathy, or lumbosacral radiculopathy. Tr. 466.

On January 6, 2009, Frazier saw William Washington, M.D., for her continuing complaints of low back pain. Dr. Washington reviewed the November 2008 MRI. Tr. 459. Frazier denied any abdominal pain, bowel or bladder incontinence, and focal lower extremity weakness, though she appeared weak. *Id*. On examination, Frazier reported pain at the lumbosacral junction that increased when she tried to stand up, and radiation of pain to her hips, as well as tenderness, but her physical examination results were generally normal with a negative straight leg raise and normal lower extremity power with no atrophy. Tr. 460. Dr. Washington restarted Frazier on a muscle relaxant and recommended physical therapy or epidural steroidal injections. *Id*. Ultimately, epidural steroidal injections were performed once per month from February through April. Tr. 613-15. On February 17, 2009, Dr. Washington reported that February's epidural provided "essentially complete pain relief of [Frazier's] back and leg pain," which enabled her to "walk better and further". Tr. 457.

On February 24, 2009, Frazier told Dr. Andrefsky that the epidural had relieved her back pain until she did some mopping, at which point the pain returned. Tr. 454. However, Frazier also noted that her back pain and leg pain "were significantly improved". *Id*. Frazier also reported one headache per week and no new neurological problems. *Id*.

On April 14, 2009, Frazier was seen by Dr. Washington for a follow-up regarding her low back pain. Tr. 544-45. She reported some mild back pain, with activity such as vacuuming, walking, and standing generally aggravating her symptoms. Tr. 544. On examination, Frazier had mild backache at the lumbosacral junction, which worsened with lumbar extension. *Id.*

8

Frazier returned to Dr. Khetarpal on April 20, 2009, and complained of rectal bleeding for two to three weeks.  Tr. 525-27.  She had irritation from diarrhea and was having five to six stools per day.  Tr. 525.  A CT scan of the abdomen on April 23, 2009 showed no acute abdominal pathology.  Tr. 523.  X-rays of the chest revealed no acute process or other significant findings.  Tr. 524.  On May 8, 2009, Dr. Khetarpal indicated that Frazier's rectal bleeding is likely related to internal hemorrhoids.  Tr. 519-21.  She had reported doing well until the previous day, when she had moderate bleeding and that the bleeding was associated with increased activity.  Tr. 519.  Frazier was having two to three stools per day.  *Id*.  Physical examination was unremarkable with only some mild right lower abdominal tenderness.  *Id*.

Frazier saw Dr. Washington on June 16, 2009, with complaints of increased back pain and generalized body aches.  Tr. 540-41.  On examination, Frazier had marked tenderness to palpation, along with numerous myofascial tender points.  Tr. 540.  Straight leg raise was negative and lower extremity reflexes were intact.  *Id*.  Dr. Washington indicated chronic widespread pain, fatigue, and morning stiffness consistent with fibromyalgia syndrome.  *Id*.  On October 6, 2009, Frazier reported to Dr. Washington that she had significant improvement with Savella, a selective serotonin and norepinephrine reuptake inhibitor used to treat fibromyalgia, and that she had a decrease in generalized achy pain and improved activity.  Tr. 538.  Dr. Washington stated that "[s]he is generally feeling better."  *Id*.  On physical examination, Frazier had achiness in the upper trapezius that was less tender than on her prior examination and low back pain.  *Id*.  She no longer had leg pain.  *Id*.

On January 12, 2010, Frazier visited Dr. Washington for a follow-up appointment.  Tr. 536-37.  She reported improvement in her symptoms, and examination was essentially normal.  *Id.*  Dr. Washington indicated chronic widespread body pain, fatigue, and morning stiffness, consistent with fibromyalgia syndrome, along with lumbar spondylolisthesis with foraminal

stenosis.  *Id*.  Frazier had a follow-up appointment with Dr. Washington on April 8, 2010, where she complained of increased standing pain in the gluteal region that radiated into the right posterior thigh.  Tr. 632-33.  Dr. Washington noted that the pain had been relatively well controlled.  Tr. 632.  Frazier also reported loose stools, but "no worse than what is typical for her", and denied any new focal weakness.  *Id*.  She also reported occasional stress incontinence of the bladder, but no nausea.  *Id*.  On physical examination, Frazier had some tenderness in her upper trapezius, was ambulatory without assistive devices, had a reciprocal gait pattern, and had a negative straight-leg raise test bilaterally.  *Id*.

**C.      Hearing Evidence**

        **1.      Frazier's Testimony**

        Frazier testified she continued to experience weekly migraines and headaches three times per week severe enough to lie down.  Tr. 50.  She testified that she continues to suffer vomiting and loose stools multiple times daily, up to six times a day on bad days, which occur about twice a week. Tr. 54-55.  She also stated that her fibromyalgia continues to affect her legs and stability and cause burning in her arms. Tr. 55-56.

        **2.      Vocational Expert's Testimony**

        The ALJ asked the vocational expert to consider a hypothetical person with Frazier's vocational characteristics who could lift and carry up to 10 pounds occasionally and 5 pounds frequently; stand and walk no more than 2 hours (no more than 20 minutes at a time); sit up to 6 hours (up to 60 minutes at a time) cannot climb ladders, ropes, or scaffolds; can only occasionally climb steps or ramps, bend, stoop, crouch, squat, kneel, or crawl; could perform low-stress work only with no high or strict production quotas, assembly line work, or piece-rate work; could not do any work that involves negotiation, confrontation, arbitration, or other intense interpersonal interactions with the public, co-workers, or supervisors; and could not supervise,

manage, or be responsible for the health, safety, or welfare of others.  Tr. 71-72.  In response, the vocational expert testified that the hypothetical individual could perform the jobs of general office clerk, charge account clerk, and order clerk in the food and beverage industry.  Tr. 73. With the requirement that the individual be able to go to the bathroom once per hour, the vocational expert testified that such a person could still perform the jobs previously mentioned – albeit in small, though still significant, numbers. Tr. 74-75. With a limitation providing that the individual be absent, leave early, or arrive late once per week, the vocational expert testified that such individual "would have trouble sustaining full-time work."  Tr. 75.

### III. Standard for Disability

**A.	Initial Disability Determination**

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy….

42 U.S.C. § 423(d)(2).  In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis, which is summarized as follows:

1.	If the claimant is doing substantial gainful activity, he is not disabled.

2.	If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.	If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least

twelve months, and his impairment meets or equals a listed impairment, claimant
is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess
the claimant's residual functional capacity and use it to determine if claimant's
impairment prevents him from doing past relevant work.  If claimant's
impairment does not prevent him from doing his past relevant work, he is not
disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on
his vocational factors and residual functional capacity, he is capable of
performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L.

Ed. 2d 119, 107 S. Ct. 2287 (1987).  The claimant has the burden of proof at Steps One through

Four.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to

the Commissioner at Step Five to establish whether the claimant has the residual functional

capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

**B.      Cessation of Benefits**

When, as here, a recipient of disability benefits challenges the cessation of benefits, the

central issue is whether the recipient's medical impairments have improved to the point where

she is able to perform substantial gainful activity.  42 U.S.C. § 423(f)(1); *Kennedy v. Astrue,* 247

F. App'x 761, 764 (6th Cir. 2007)  Whether an individual's entitlement to benefits continues

depends on whether "there has been any medical improvement in [the individual's]

impairment(s) and, if so, whether this medical improvement is related to [the individual's] ability

to work." 20 C .F.R. §§ 404.1594(b), 416.994(b).

The cessation evaluation process is a two-part process.  *See Kennedy,* 247 F. App'x at

764–65.  The first part of the process focuses on medical improvement.  *Id.* at 764.  The

implementing regulations define "medical improvement" as "any decrease in the medical

severity of [the individual's] impairment(s) which was present at the time of the most recent

favorable medical decision that [the individual was] disabled or continued to be disabled." *Id.* at 764–65 (citing 20 C.F.R. § 404.1594(b)(1)).  "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the individual's] impairment(s).... 20 C.F.R. §§ 404.1594(b)(1)(i), 416.994(b) (1)(i).  If there has been a decrease in the severity of the impairments since the favorable decision, the medical improvement is related to the individual's ability to work only if there has been a corresponding 'increase in [the claimant's] functional capacity to do basic work activities....' " *Kennedy,* 247 F. App'x at 765 (quoting 20 C.F.R. § 404.1594(b)(3)); s*ee also Nierzwick v. Commissioner of Social Security,* 7 F. App'x 358, 361 (6th Cir. 2001).

The second part of the cessation analysis focuses on whether the individual has the ability to engage in substantial gainful activity.  *Kennedy,* 247 F. App'x at 765.  The implementing regulations for this part of the evaluation incorporate many of the standards set forth in the regulations that govern initial disability determinations.  *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7)).  The difference is that "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7); *Griego v. Sullivan,* 940 F.2d 942, 944 (5th Cir. 1991)).  An increase in the claimant's functional capacity will lead to a cessation of benefits only if, as a result, the claimant can perform her past work or other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1594(f)(7), (8), 416.994(f)(7), (8).

In deciding whether a recipient's entitlement to disability benefits has ended, the Commissioner uses the eight-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1594(f)(1)-(8) and 416.994(f)(1)-(8). *Kennedy,* 247 F. App'x at 764.  The steps are:

1.  Are you engaging in substantial gainful activity? If you are ... we will find disability to have ended ....

13

2. If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.

3. If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section?....

4. If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section....

5. If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply....

6. If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe....

7. If your impairment(s) is severe, ... we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

8. If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment.... If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.

20 C.F.R. §§ 404.1594(f), 416.994(f).  There is no presumption of continuing disability.

*Kennedy,* 247 F. App'x at 764 (citing *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284, 286–287 n. 1 (6th Cir. 1994)). Instead, the Commissioner applies the above procedures to determine whether the claimant's disability has ended and if she is now able to work. *Id.*

### IV. The ALJ's Decision

At Step One of the sequential analysis, the ALJ determined that Frazier had not engaged in substantial gainful activity since her alleged onset date of August 29, 2007.  Tr. 17.   At Step

Two, he found that Frazier had the following severe impairments: degenerative disc disease of the lumbar spine with neural foraminal stenosis at L4-5, irritable bowel syndrome, chronic kidney disease, hypertension, and obesity.  Tr. 18-19.  The ALJ also found that Frazier had the following non-severe impairments: headaches, deviated septum and/or sinusitis, rectal bleeding, hepatomegaly, edema in the lower extremities, hypotension, degenerative disc disease of the cervical spine, fibromyalgia, diabetes, hiatal hernia, partial hearing loss, and depression.  Tr. 19-23.  At Step Three, the ALJ found that Frazier did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.[2]  Tr. 23.  The ALJ then determined Frazier's RFC for the period of August 29, 2007 to September 30, 2008, and found that she had the RFC to perform work activities except for the following limitations:

> [C]ould lift and carry up to and no more than 10 pounds occasionally and 5 pounds frequently; could stand and/or walk up to and no more than a total of 2 hours per 8-hour workday; could stand and/or walk up to and no more than 20 minutes at a time; could sit up to and no more than 6 hours per 8-hour workday; could sit up to and no more than 60 minutes at a time; could not climb ladders, ropes, or scaffolds; could climb steps and ramps up to and no more than occasionally; could bend, stoop, crouch, kneel, and crawl up to and no more than occasionally, would either have to been absent from work, or would be late getting to work, or would have to leave work early, at least once per week because of her impairments.

Tr. 26-28.  At Step Four, the ALJ found that Frazier could not perform her past relevant work.  Tr. 28.  At Step Five, after considering her vocational factors, RFC, and the evidence from the VE, the ALJ found that, for the period of August 29, 2007 to September 30, 2008, Frazier was not capable of performing other work that existed in significant numbers in the national

---

[2]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

economy.  Tr. 31.  The ALJ therefore found that Frazier was under a disability from August 29, 2007 through September 30, 2008.  Tr. 32.

Under the analysis for cessation of benefits, at Step One, the ALJ determined that Frazier had not engaged in substantial gainful activity from October 1, 2008 through the date of the decision.  Tr. 32.  At Step Two, the ALJ found that, from October 1, 2008 through the date of the decision, Frazier did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.  Tr. 33. At Step Three, the ALJ found that medical improvement occurred beginning on October 1, 2008. Tr. 33.  At Step Four, the ALJ then determined the medical improvement that had occurred related to Frazier's ability to work.  Tr. 33.  At Step Five, the ALJ determined that none of the exceptions to medical improvement applied.  Tr. 34.  At Step Six, the ALJ determined that Frazer had the same severe impairments and non-severe impairments as stated in the initial disability determination.  Tr. 34.  At Step Seven, the ALJ determined Frazier's RFC for the period of Oct 1, 2008 to the date of the decision, and found that Frazier could perform work activities except for the following limitations:

> [C]ould lift and carry up to and no more than 10 pounds occasionally and 5 pounds frequently; could stand and/or walk up to and no more than a total of 2 hours per 8-hour workday; could stand and/or walk up to and no more than 20 minutes at a time; could sit up to and no more than 6 hours per 8-hour workday; could sit up to and no more than 60 minutes at a time; could not climb ladders, ropes, or scaffolds; could climb steps and ramps up to and no more than occasionally; and could bend, stoop, crouch, kneel, and crawl up to and no more than occasionally.

Tr. 34.[3]  The ALJ found that Frazier still could not perform her past relevant work.  Tr. 35.

Finally, at Step Eight, after considering her vocational factors, RFC, and the evidence from the

---

[3] It should be noted that Frazier's RFC as of October 1, 2008 is the same as her RFC from August 29, 2007 through September 30, 2008, except that the ALJ eliminated the limitation that Frazier would either be absent from work, late getting to work, or having to leave work early at least once per week because of her impairments.  As discussed in more detail below, the ALJ apparently determined that, because of her medical improvements, Frazier would no longer have to miss work once per week.  Tr. 33-35.

VE, the ALJ found that, for the period of October 1, 2008, to the date of the decision, Frazier was capable of performing work that existed in significant numbers in the national economy.  Tr. 36.  Thus, the ALJ concluded that Frazier's disability ended on October 1, 2008, and that she was not under a disability from that date through the date of the decision.

## V.  Arguments of the Parties

Frazier argues that the ALJ's RFC finding is not supported by substantial evidence because many of Frazier's medical conditions, including fibromyalgia, gastrointestinal problems, and headaches, did not improve after September 30, 2008.  Doc. 13, pp 16-19.  Frazier also contends that the ALJ's determination that the limitation of missing work once per week did not exist after September 30, 2008, lacks the support of substantial evidence.  *Id*.

In response, the Commissioner argues that substantial evidence supports a finding that Frazier experienced medical improvement effective October 1, 2008.  Doc. 14, pp. 16-20.  In particular, the Commissioner points out that Frazier's headaches, gastrointestinal problems, and fibromyalgia symptoms all improved such that she retained generally the same RFC as she had before, but she would no longer need to be absent from work, late getting to work, or leave work early once per week.  *Id*.

## VI. Law and Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari,* 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.,* 966 F.2d 1028,

17

1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984).

**B.  Issue Presented**

This case presents two questions: (1) Does substantial evidence support the ALJ's determination that medical improvement occurred as of October 1, 2008, and (2) Did the ALJ adequately explain the connection between the medical improvement and the revision he assessed in Frazier's RFC as of that date, whereby he eliminated a limitation that Frazier would either be absent from work, late getting to work, or having to leave work early at least once per week because of her impairments?  Each issue will be addressed in turn.

**1.  Substantial evidence supports the ALJ's determination that Frazier's medical condition improved after September 30, 2008**

Frazier argues that the ALJ's determination that her medical condition improved is not supported by substantial evidence.  Doc. 13, pp. 16-19.  She contends that many of her impairments, including fibromyalgia, gastrointestinal problems, and headaches, did not experience any improvement and a finding of improvement lacks substantial evidence.[4]  *Id*.

The ALJ found that Frazier's fibromyalgia was not a severe impairment and noted that there was no evidence that Frazier had ever been examined for the purpose of diagnosing

---

[4] Frazier has not argued that her back injuries did not improve, even though many of her medical appointments were related to her back injuries.

18

fibromyalgia or treated for fibromyalgia.  Tr.  21.  Therefore, fibromyalgia was not a basis for finding that Frazier had a disability from August 19, 2007 through September 30, 2008.  Frazier argues that, contrary to the ALJ's finding, she was diagnosed and treated for fibromyalgia and that her symptoms did not improve after September 30, 2008.  Doc. 13, p. 17.  In support of this argument, Frazier points to Dr. Washington's June 16, 2009, examination, where he found that Frazier had numerous myofascial tender points, chronic widespread pain, fatigue, and morning stiffness "consistent with fibromyalgia."  Doc 13, p. 17; Tr. 540-41.

Frazier appears to challenge the ALJ's finding under Step Two that her fibromyalgia was not a severe impairment because she was diagnosed with, and treated for, this condition.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988).  Even if Frazier was diagnosed with fibromyalgia, the mere diagnosis of a medical condition is insufficient to establish a severe impairment unless there is some information concerning the limitations it imposes on the claimant's ability to work.  *Id*.  Moreover, fibromyalgia presents difficulties in disability analysis because, "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007); *Swain v. Comm'r of Soc. Sec.*, 297 F.Supp.2d 986, 990 (N.D. Ohio 2003).  "Objective medical evidence corroborating allegations of pain derived from fibromyalgia is often nonexistent." *Freese v. Astrue*, 3:11CV99, 2012 WL 630038 (N.D. Ohio Feb. 27, 2012). Because of this, the Sixth Circuit has recognized that, in claims regarding fibromyalgia, the cause of disability is the underlying symptoms associated with the condition, not the condition itself.  *Rogers*, 486 F.3d at 247.  Whether Frazier's condition is characterized as "fibromyalgia" or "consistent with fibromyalgia symptoms" is not dispositive of a finding of disability.  A mere "diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 806 (6th Cir. 2008).  In this case, there is no evidence that

Frazier's fibromyalgia-like symptoms would preclude her from performing all work and the ALJ's opinion is thus supported by substantial evidence.

Frazier also argues that her fibromyalgia symptoms did not improve after September 30, 2008.  This argument is unpersuasive.  Frazier cites her June 16, 2009, visit to Dr. Washington as the basis for finding the ALJ's decision lacked substantial evidence.  Doc 13, p. 17.  This argument is irrelevant to the question whether substantial evidence supports the ALJ's determination that her condition improved as of October 1, 2008, because it indicates that the first instance of symptoms consistent with fibromyalgia was on June 16, 2009, some eight and one half months later.  Additionally, substantial evidence supports a conclusion that this alleged new impairment did not significantly affect Frazier's RFC.  After the initial visit to Dr. Washington, Frazier had follow-up visits on Oct. 6, 2009, and January 12, 2010.  Tr. 538-39; 536-37.  At the October 6, 2009 visit, Frazier reported that she had experienced significant improvement of her general pain and body aches.  Tr. 538.  At the January 12, 2010 appointment, Frazier reported further improvement of her widespread body aches.  Tr. 536. Therefore, substantial evidence exists to support a conclusion that, even if Frazier had received a formal diagnosis of fibromyalgia or experienced significant fibromyalgia symptoms, the symptoms were not so severe as to have an effect on Frazier's RFC.

Frazier next argues the ALJ's findings with regard to her gastrointestinal issues were not supported by substantial evidence because, on April 20, 2009, she told Dr. Khetarpal that she had five to six stools per day and had irritation from diarrhea; on May 8, 2009 she reported two to three stools per day; and she testified that she experienced vomiting and loose stools.  Tr. 54-55, 519-21, 525.  The medical evidence of record, however, documents significant improvement in Frazier's gastrointestinal issues.  Indeed, prior to starting Reglan, Frazier repeatedly reported nausea, vomiting, and/or diarrhea.  Tr. 296, 369, 400, 410, 421, 429, 431, 436, 440, 580.  She

20

further reported abdominal tenderness on multiple occasions, and even "lots of pain at least twice a week." Tr. 394, 400, 416, 421, 429, 431, 440, 580. On February 20, 2008, she reported chronic diarrhea to Dr. Kelley. Tr. 547. On April 9, 2008, Frazier reported having five to six stools in the morning alone followed by abdominal cramping. Tr. 410, 436. On August 13, 2008, Frazier had four stools before her appointment with Dr. Khetarpal. Tr.394.

However, the evidence shows that, after Frazier started taking Reglan, her gastrointestinal issues improved. On September 30, 2008, Dr. Khetarpal reported that Frazier "finally started doing well" and that "[t]he use of Reglan certainly has helped her symptoms." Tr. 33, 502. He further reported that her gastroparesis symptoms, nausea, and abdominal distention had resolved, although she still had intermittent episodes of diarrhea. *Id*. This evidence shows that there was a decrease in severity of Frazier's gastrointestinal symptoms. Further, on January 6, 2009, Frazier denied abdominal pain and bladder incontinence. Tr. 459. On January 16, 2009, Frazier again did not report any abdominal pain. Tr. 616. On April 20, 2009, Frazier visited Dr. Khetarpal and noted irritation from diarrhea, as well as five to six stools per day. Tr. 525. During a May 8, 2009, follow-up, Frazier reported rectal bleeding but also normal stools and denied nausea or vomiting since adjusting her Reglan dosage. Tr. 519. On March 5, 2010, Frazier denied gastrointestinal symptoms during a hospital visit. Tr. 556. On April 8, 2010, Frazier reported to Dr. Washington loose stools, but "no worse than what is typical for her," and denied nausea. Tr. 632-33. It is apparent from the record that, while Frazier experienced at least one flare-up of her gastrointestinal symptoms, substantial evidence exists to support a conclusion that there was a meaningful improvement with regard to her gastrointestinal symptoms. Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 477.

Frazier last argues that her headaches did not improve after September 30, 2008.  Doc. 13, pp. 17-18.  The ALJ found "no evidence in the record that Ms. Frazier's headaches and hypertension were worse after September 30, 2008 than they were before that date."  Tr. 33. Frazier argues that this conclusion is not supported by substantial evidence.  Doc. 13, p 18.  On October 27, 2008, Dr. Andrefsky treated Frazier for headaches, occurring once to twice per week. Tr. 478-79. On December 2, 2008, Frazier reported a severe headache the week prior.  Tr. 469.  On February 24, 2009, Frazier reported one headache per week but no new neurological problems.  Tr. 454.  On April 11, 2009, Frazier went to the hospital reporting rectal bleeding, but also indicated that she was not having headaches.  Tr. 532.  On March 1, 2010, Frazier was seen by Dr. Mirande for a follow-up regarding her headaches.  Tr. 595-97.  She indicated sudden daily headaches since January 1, 2010, stemming from facial injuries suffered during a domestic assault.  *Id*.

Substantial evidence exists to support the ALJ's determination that Frazier's headaches were not worse after September 30, 2008. As previously indicated, even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 477.  Frazier's symptoms do not need to be completely resolved to support a finding of medical improvement.  Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision…."  20 C.F.R. §§404.1594(b)(1), 416.994(b)(1).  Here, while the record indicates that Frazier still occasionally experienced headaches, she complained of daily headaches less frequently after September 30, 2008, than she did before.  The ALJ's finding that the headaches were no worse after September 30, 2008, and, in fact, were under better control is supported by substantial evidence.

Moreover, with regard to the date of the medical improvement, the ALJ need not select dates that "neatly correspond to any 'smoking gun' medical documents that unequivocally explain why the ALJ chose those dates." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 285 (6th Cir. 2009). The ALJ instead must determine a date that is not "so wholly arbitrary so as to carry the ALJ's decision outside of the 'zone of choice' that the ALJ possesses in rendering disability decisions." *Id*; Doc. 14, p. 18. The ALJ's choice of Frazier's September 30, 2008, appointment for a finding of medical improvement is not so wholly arbitrary, as it is the date on which Dr. Khetarpal noted significant improvements with regard to Frazier's gastrointestinal issues.

Finally, it should be noted that the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *White*, 572 F.3d at 284. Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. Here, the ALJ reviewed the entire record, weighed the evidence, and determined that Frazier experienced medical improvement. This decision is supported by substantial evidence.

    **2.**     **The ALJ failed to provide sufficient reasoning for changing Frazier's RFC, based on medical improvement, to eliminate the limitation that Frazier would either be absent from work, late getting to work, or having to leave work early at least once per week because of her impairments**

The ALJ found that Frazier retained the same physical limitations after September 30, 2008, as she had before that date, except that her impairments no longer required her to be absent from work, late getting to work, or leave work early once per week. Tr. 34. He therefore modified Frazier's RFC to eliminate this restriction. At the hearing, the VE testified that jobs existed in significant numbers in the regional and national economy that Frazier could perform with her updated RFC. *Id.* However, Frazier argues that, because she did not experience medical improvement, the ALJ lacked the support of substantial evidence in determining that the

23

limitation of missing work once per week did not exist after September 30, 2008.  Doc. 13, pp

16-19.  She further states that her "chronic back pain, fibromyalgia pain, headaches, irritable

bowel syndrome, and not insignificantly her intense schedule of frequent medical appointments,

tests, and emergencies all support a finding that Plaintiff would have missed work weekly, from

the alleged onset date through the date of the ALJ's decision."  Doc. 13, pp 18-19.

Even though substantial evidence exists to support the ALJ's determination that Frazier

experienced medical improvement after September 30, 2008, he did not sufficiently explain the

connection between the medical improvement and the adjusted RFC, in which the restriction that

Frazier would miss work once per week was eliminated.  "[T]he adjudicator's assessment of an

individual's RFC may be the most critical finding contributing to the final determination or

decision about disability."  SSR No. 96-5p, 1996 SSR LEXIS 2, *14 (July 2, 1996).  Moreover,

as a rule, the ALJ must build an accurate and logical bridge between the evidence and his

conclusion.  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011); *see also Wilson v.*

*Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004) (finding it was not harmless error for

the ALJ to fail to make sufficiently clear why he rejected the treating physician's opinion, even if

substantial evidence not mentioned by the ALJ may have existed to support the ultimate decision

to reject the treating physician's opinion).  "Where the ALJ's decision lacks evidentiary support

or is so poorly articulated as to prevent meaningful review, the case must be remanded."

*Castello v. Commissioner of Social Sec.,* 5:09 CV 2569, 2011 WL 610590, at *2 (N.D. Ohio Jan

10, 2011) (*quoting Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007) (internal quotation

omitted); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) (the ALJ's analysis must allow

reviewing court to trace the path of his reasoning) (*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d

345, 351 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also

explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review").

Here, the ALJ failed to make sufficiently clear why, based on Frazier's medical improvement, she would no longer need to miss work, be late for work, or leave early from work one time per week due to her impairments. Tr. 34. Indeed, the ALJ did not explain how and to what degree the medical improvement affected Frazier's limitation of missing work once per week. There is simply no analysis as to why, after October 1, 2008, Frazier would not continue to have to miss work once per week because of her impairments. While the ALJ's findings may be supported by substantial evidence in the record, the Court cannot make that determination because the ALJ failed to explain sufficiently the impact of Frazier's medical improvement on her RFC, thus preventing meaningful review. For that reason, the Commissioner's decision should be reversed and remanded. On remand, the ALJ should specifically address why, based on Miller's medical improvement, she would not either be absent from work, late getting to work, or leaving work early once per week because of her severe impairments, which, although improved, continued to exist after September 30, 2008.

### VII. Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner should be **REVERSED** and this case **REMANDED** for further proceedings.[5]

Dated: December 3, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

---

[5] The recommendation to remand is not a determination by the undersigned that Frazier is disabled after September 30, 2008.

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).